11 CV 3128

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
CITY OF DANIA BEACH POLICE & : Civil Action No.
FIREFIGHTERS' RETIREMENT SYSTEM, :
Individually and on Behalf of All Others : CLASS ACTION
Similarly Situated, :
:  COMPLAINT FOR VIOLATION OF §1 OF
             Plaintiff, : THE SHERMAN ACT
:
     vs. :
:
BANK OF AMERICA CORPORATION, :
CITIBANK, N.A., UBS AG and DOES 1-10, :
inclusive, :
:
             Defendants. :
:
---------------------------------------------------------------- x  DEMAND FOR JURY TRIAL

Plaintiff City of Dania Beach Police & Firefighters' Retirement System, upon information and belief, brings this action by its undersigned attorneys against Bank of America Corporation ("Bank of America"), Citibank, N.A. ("Citibank"), and UBS AG ("UBS") (collectively, "Defendants"), on behalf of itself and all others who transacted in securities linked to the London interbank offered rate (hereinafter "LIBOR") between 2006 and 2009 (the "Class Period").

## INTRODUCTION

1.  This action arises from Defendants' conspiracy to intentionally and unlawfully manipulate the LIBOR by deliberately and intentionally understating their respective borrowing costs to the British Bankers' Association ("BBA") between 2006 and 2009.

2.  LIBOR is the benchmark for the cost of borrowing between banks and is used to set interest rates for thousands of financial products. About $350 trillion worth of financial products globally reference LIBOR. LIBOR is the average rate at which a bank can obtain unsecured lending and is produced in ten currencies with 15 different maturities quoted for each, ranging from overnight to 12 months.

3.  Every morning at 11:00 a.m. London time, each member bank submits the rate at which it believe it could borrow funds on that day. The banks submit their figures through a purportedly protected system, which immediately discards the four highest and four lowest figures and uses an average of the remaining two quartiles to calculate LIBOR. Once calculated, the number is broadcast on the *Thomson Reuters* system and through other information systems such as *Bloomberg*, with each individual banks' submission published simultaneously.

4.  The rates are then set at midday London time each day by the BBA. Until February 2011, representatives from 16 banks were asked the above question, and their answers served to set LIBOR. In February 2011, panel sizes were increased and there are now 20 banks that participate.

Currently, from the rates provided, the highest five and the lowest five are discounted with the remainder averaged to give the LIBOR rate.

5. In May 2008, *The Wall Street Journal* reported that Citibank, WestLB, HBOS, J.P. Morgan Chase & Co. and UBS reported significantly lower borrowing costs for LIBOR than what another market measure suggested they should be. Those five banks were members of the 16-bank panel that reported rates used to calculate LIBOR in dollars. That led LIBOR, which was supposed to reflect the average rate at which banks lend to each other, to act as if the banking system was doing better than it was at critical junctures in the financial crisis. The reliability of LIBOR was and remains crucial to consumers and businesses around the world.

6. On May 3, 2011, *Bloomberg* reported that European antitrust regulators had opened investigations into whether lenders and the 16 member banks had manipulated the LIBOR.

7. Defendants devised and executed their scheme to manipulate and suppress LIBOR to benefit their financial positions by intentionally understating their borrowing costs. Defendants paid lower interest rates to customers who bought Defendants' products that have rates of return that were tied to LIBOR during the Class Period. Defendants' coordinated understatement of borrowing costs guaranteed that they could pay lower rates of return to customers who bought products that have rates of return tied to LIBOR.

8. Defendants' manipulative and anticompetitive trading activity directly caused and resulted in an artificially lower LIBOR during the Class Period.

9. Defendants' conspiracy to manipulate LIBOR violates §1 of the Sherman Act, 15 U.S.C. §1. Plaintiff and members of the Class suffered damages by purchasing Defendants' products that have rates of return tied to LIBOR during the Class Period, as more fully alleged herein.

## JURISDICTION AND VENUE

10. This action arises under §1 of the Sherman Act, 15 U.S.C. §1.

11. This Court has jurisdiction under 28 U.S.C. §§1331 and 1337 and §§4 and 16 of the Clayton Act, 15 U.S.C. §§15(a) and 26. Venue is proper in this District pursuant to §§4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and 28 U.S.C. §1391(b), (c) and (d). One or more of the Defendants resided, transacted business, was found, or had agents in the District, and a substantial part of the events giving rise to plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described herein has been carried out, in this District.

## PARTIES

**Plaintiff**

12. Plaintiff City of Dania Beach Police & Firefighters' Retirement System ("City of Dania Beach") is a resident of the State of Florida. During the Class Period, City of Dania Beach purchased floating rate debt at a rate of interest that was depressed and was injured in its property as a result of Defendants' unlawful conduct.

**Defendants**

13. Defendant UBS is a Swiss company based in Basel and Zurich, Switzerland, with banking offices in Stamford, Connecticut and New York, New York. At all relevant times, UBS was a contributing member of the BBA's LIBOR panel.

14. Defendant Bank of America is a Delaware corporation headquartered in Charlotte, North Carolina. At all relevant times, Bank of America was a contributing member of the BBA's LIBOR panel.

15. Defendant Citibank is a wholly owned subsidiary of Citigroup, Inc. ("Citigroup"), a Delaware financial holding company headquartered in New York, New York. At all relevant times, Citibank was a contributing member of the BBA's LIBOR panel.

**Unnamed Co-Conspirators**

16. Plaintiff alleges on information and belief that at all relevant times, Doe Defendants 1-10, inclusive, performed, participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein, including the manipulation of LIBOR. These unnamed co-conspirators, whose identities are presently unknown to plaintiff, participated as co-conspirators in the acts complained of, and performed acts and made statements which aided and abetted and were in furtherance of the unlawful conduct, including the numerous banks that were involved in the setting of LIBOR during the Class Period. Those banks include Bank of Tokyo, Mitsubishi UFJ, Barclays Bank plc ("Barclays"), J.P. Morgan Chase & Co., Credit Suisse Group AG, Deutsche Bank AG, HBOS plc, HSBC Holdings plc, Lloyds Banking Group plc, The Norinchukin Bank, Rabobank, Royal Bank of Canada, Royal Bank of Scotland, and WestLB AG. At all relevant times, these co-conspirators were contributing members of the BBA's LIBOR panel. Plaintiff is presently unaware of the true names and identities of those defendants sued herein as Doe Defendants 1-10. Any reference made to such defendants by specific name or otherwise, individually or plural, is also a reference to the actions of Doe Defendants 1-10, inclusive.

**FACTUAL ALLEGATIONS**

17. Until early 2008, the cost of insuring against banks defaulting on their debts (the default insurance market) moved largely in tandem with LIBOR. Both tended to rise when the market thought banks faced financial problems. But beginning in late January 2008, as fears grew about possible bank failures, the two measures began to diverge, with reported LIBOR rates failing to reflect rising default-insurance costs.

18. The gap between the two measures was particularly wide for Citibank, WestLB, HBOS, J.P. Morgan Chase & Co. and UBS.

19. One explanation for the gap is that banks understated their borrowing rates. Prices for default insurance provide a good picture of investors' assessment of the financial health of banks. Payments on nearly $90 trillion in dollar-denominated mortgage loans, corporate debt and financial contracts rise and fall according to LIBOR's movements. Understating LIBOR harms banks' lenders, who purchased a variety of financial products – floating rate coupons, variable rate checking accounts, and variable rate savings accounts – that have rates of return tied to LIBOR. Others were also harmed, such as mutual funds that invest in mortgages and certain hedge funds that use derivative contracts tied to LIBOR.

20. At times of market turmoil, banks faced a dilemma and that dilemma incentivized those banks to manipulate LIBOR downward. If any bank submits a much higher rate than its peers, it risks looking like it is in financial trouble. Thus, banks had an incentive to report similar rates – which caused the reported rates to cluster together.

21. During the first four months of 2008, the three-month borrowing rates reported by the 16 banks on the LIBOR panel remained, on average, within a range of only 0.06 of a percentage point – tiny in relation to the average dollar LIBOR of 3.18%. This historically anomalous phenomenon was reported by *The Wall Street Journal* ("*Journal*") in a study the newspaper conducted. Those reported rates "'are far too similar to be believed,'" says Darrell Duffie, a Stanford University finance professor. Mikhail Chernov, a finance professor at London Business School confirmed the *Journal*'s methodology was an appropriate way to assess the reported LIBOR rates. David Juran, a statistics professor at Columbia University who also reviewed the methodology, said that for almost all of the 16 panel banks, the calculations show "'very convincingly'" that reported LIBOR rates are lower than what the market thinks they should be. In

fact the difference in those rates reported in the *Journal* study well surpasses the threshold statisticians use to assess the significance of a result.

22.     The chart below shows that in late 2008, Defendants reported nearly identical rates to borrow dollars for three months.



23.     At times, banks reported similar borrowing rates even when the default-insurance market was drawing big distinctions about their financial health. For example, on the afternoon of March 10, 2008, investors in the default-insurance market were betting that WestLB, which was hit especially hard by the credit crisis, was nearly twice as likely to renege on its debts as Credit Suisse, which was perceived to be in better shape. But the next morning, for LIBOR purposes, WestLB reported the same borrowing rate as Credit Suisse.

24.     In addition to borrowing from other banks, banks can borrow in the commercial-paper market, where they issue short-term IOUs to investors such as mutual funds. In mid-April 2008,

UBS, which suffered some $38 billion in write-downs on investments gone bad during the financial crisis, was offering to pay an annual rate of about 2.85% to borrow dollars for three months in the commercial-paper market. But when it reported for LIBOR purposes on April 16, 2008, UBS said it could borrow for three months from other banks at 2.73% – in line with all the other panel banks.

25.     In mid-March 2008, the bank borrowing rates calculated using default-insurance data rose sharply amid growing fears about the financial health of banks, which culminated in the collapse of Bear Stearns Cos. But LIBOR actually declined. There was a divergence between LIBOR rates when compared to derivatives known as "credit-default swaps," which reflect the likelihood of a bank defaulting on its debt. Generally, there should be a strong correlation between LIBOR levels and credit-default swap prices, but the data reviewed by regulators showed that LIBOR was lower than credit-default swap levels implied.

26.     Between late January 2008 and April 16, 2008, when the *Journal* first reported concerns about LIBOR's accuracy, Citibank's reported rates differed the most from what the default-insurance market suggested. On average, the rates at which Citibank said it could borrow dollars for three months were about 0.87 of a percentage point *lower* than the rate calculated using default-insurance data. The difference was 0.7 of a percentage point for WestLB, 0.57 for HBOS, 0.43 for J.P. Morgan, and 0.42 for UBS. Royal Bank of Canada's reported rates came closest to the market-based calculation – there was no significant difference.

27.     Overall, in the first four months of 2008, the three-month and six-month dollar LIBOR rates were about a quarter percentage point lower than the borrowing rates suggested by the default-insurance market.

28.     Beginning in late 2007, some bankers began to suspect LIBOR was not high enough. Questions about the rate arose at meetings held in November 2007 and April 2008 by a Bank of

England money-market committee that includes banks and the BBA. The minutes of the committee's April 3, 2008 discussions said that "U.S. dollar Libor rates had at times appeared lower than actual traded interbank rates."

29. Even Citibank acknowledged the glaring disparity. One of its interest rate strategists, Scott Peng, raised such questions in an April 10, 2008 report, writing that "LIBOR at times no longer represents the level at which banks extend loans to others." The BBA complained to the bank and asked about having the report withdrawn, according to people familiar with the situation. Citibank declined.

30. After the *Journal* reported on April 16, 2008 that bankers suspected rivals of intentionally understating their borrowing rates, the BBA conducted a review of LIBOR. After banks adjusted their LIBOR rates following news of the BBA review in mid-April, the difference shrunk to about 0.15 of a percentage point. Indeed, the 3-month fixed U.S. dollar LIBOR rate increased nearly .2% from April 16-18, 2008. The rate was 2.734% on April 16, 2008; 2.818% on April 17, 2008 and 2.908% on April 18, 2008. This was the causing dollar-denominated LIBOR's biggest jump since August 2007. Hedge-fund manager Narayan Prasad says he uses LIBOR-based contracts known as interest-rate swaps to protect his investors from sudden shifts in the relationship between short-term and long-term interest rates. "'You expect total integrity with respect to how it is computed,'" he says. If LIBOR is off by as much as some analysts have estimated, he says, it has cost investors in his fund, Anchor Capital Group, some $500,000 in the first four months of this year.

**Regulatory Investigations**

31. In its annual report on Form 20-F, dated March 15, 2011, UBS acknowledged that it has received subpoenas from the SEC, the U.S. Commodity Futures Trading Commission and the U.S. Department of Justice in connection with investigations regarding submissions to the BBA,

which sets LIBOR rates. UBS stated that the investigations focus on whether there were improper attempts by UBS, either acting on its own or together with others, to manipulate LIBOR rates at certain times. In addition, UBS acknowledged receiving an order to provide information to the Japan Financial Supervisory Agency concerning similar matters.

32. Citibank and Bank of America are also being investigated for possible manipulation, and Citibank, Deutsche Bank, Bank of America and J.P. Morgan Chase & Co. have been asked by regulators to make employees available to testify concerning LIBOR manipulation. Additionally, in late March 2011, WestLB acknowledged it had submitted information in response to a request by U.S. regulators investigating manipulation of LIBOR.

33. According to the *Financial Times*, three U.S. agencies, the Japanese agency and the United Kingdom's Financial Services Authority had also requested information, and had begun interviewing witnesses connected to the Defendants for several months. To date, UBS, Bank of America, Citibank and Barclays have received official subpoenas, but based on sources familiar with the investigations, the *Financial Times* reported that "[a]ll the panel members are believed to have received at least an informal request for information — an earlier stage in an investigative process before a subpoena."

34. On May 3, 2011, *Bloomberg* reported that that European antitrust regulators had opened investigations into whether lenders and the 16 member banks had manipulated the LIBOR.

35. There are a limited number of financial institutions that set LIBOR. During the Class Period, only 16 banks worldwide contributed to the setting of LIBOR. As alleged more fully herein, due to the limited number of banks involved, Defendants had significant opportunities as well as financial motives to manipulate LIBOR during the Class Period.

## Defendants Had the Opportunity to Conspire Through Their Participation in Trade Associations and Through Third-Party Conduits

36.     Participation in trade associations and through third-party conduits fostered and facilitated the unlawful conspiracy. Throughout the Class Period, Defendants participated in numerous trade association activities and events together, which provided many opportunities to conspire and share confidential information and trading strategy.

37.     Defendants are members of the BBA, which describes itself as a trade association for the banking and financial services sector. Its member banks collectively provide full-service banking and financial services.

38.     Defendants had the opportunity to collude through third-party conduits. For example, in the hours before the banks report their rates, their traders could phone brokers at firms such as Tullett Prebon plc, ICAP plc and Compagnie Financiere Tradition to get estimates of where the brokers perceive the loan market to be. Through such communications, Defendants could signal their intent to report a certain rate.

39.     During the financial crisis three things happened relevant to interbank rates. First, lending rates seriously decoupled from central bank lending rates, with interbank rates soaring at the same time as central bank rates fell to historic lows. This was a phenomenon never seen since LIBOR was founded in 1986. Second, any lending rate quoted became highly theoretical because many banks had limited liquidity and did not want to admit to this as it would make their position worse. So they were not in a position to lend. Third, the banks often did not want to lend to other banks because they had no idea which would survive and which fail.

## FRAUDULENT CONCEALMENT

40. By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing. Defendants, *inter alia*, conspired and engaged in secret and surreptitious activities in order to manipulate LIBOR.

41. Defendants fraudulently concealed their participation in their conspiracy to manipulate LIBOR by, among other things, engaging in secret "signals" or communications in furtherance of the conspiracies. Because of such fraudulent concealment, and the fact that a conspiracy in restraint of trade is inherently self-concealing, plaintiff and the members of the Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

42. Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy and manipulation.

43. Plaintiff and members of the Class were lulled into believing that the rates for the products they purchased from Defendants were the result of market conditions, rather than the product of Defendants' manipulation and collusive activities.

44. Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until they became public in or around the time of the announcement of the regulatory investigations.

45. At all relevant times and in all relevant respects, plaintiff and other members of the Class exercised reasonable diligence.

46. None of the facts or information available to plaintiff and members of the Class, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint.

47. Because Defendants employed acts and techniques that were calculated to wrongfully conceal the existence of such illegal conduct, plaintiff and the Class could not have discovered the existence of this unlawful conduct any earlier.

48. Because the alleged conspiracy to manipulate LIBOR was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, plaintiff and members of the Class had no knowledge of the alleged conspiracy, did not know that LIBOR had been artificially manipulated and had no knowledge of any facts or information that would have caused a reasonably diligent person to investigate whether the conspiracies existed.

49. As a result of Defendants' conduct and concealment of their conspiracy to manipulate LIBOR, plaintiff and members of the Class were prevented from learning of the facts needed to commence suit against Defendants for the manipulative conduct alleged in this Complaint.

50. Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent plaintiff and members of the Class from suing them for the unlawful activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLASS ACTION ALLEGATIONS

51. Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure individually and on behalf of all others similarly situated. The Class is defined as all customers of Defendants who invested in a LIBOR-based product sold by Defendants between 2006 and 2009 and were paid less than they would have been paid had Defendants not conspired to depress LIBOR through their manipulative behavior.

52. Excluded from the Class are Defendants, the officers and directors of the Defendants, members of their immediate families and their heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

53. The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time, plaintiff is informed and believes that at least hundreds of thousands of geographically dispersed Class members purchased these products from Defendants during the Class Period.

54. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

55. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including securities, antitrust and other complex litigation.

56. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a) Whether Defendants conspired with others to artificially depress and manipulate LIBOR in violation of the Sherman Act;

(b) Whether Defendants' conduct negatively affected the rates of return of products purchased by plaintiff and the Class during the Class Period;

(c) The appropriate measure of damages, under the Sherman Act, sustained by plaintiff and other members of the Class as a result of Defendants' unlawful conduct and other appropriate relief.

57. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The

prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. By contrast, a class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

58.  Furthermore, as the damages suffered by individual Class members may be relatively small (although substantial in the aggregate), the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 1 of the Sherman Act

59.  Plaintiff incorporates by reference the preceding allegations.

60.  Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade in violation of §1 of the Sherman Act and §4 of the Clayton Act.

61.  During the Class Period, Defendants possessed the power to set LIBOR.

62.  The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants suppressed LIBOR. Defendants' conspiracy is a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

63.  Defendants' conspiracy, and resulting impact on LIBOR, occurred in or affected interstate and international commerce.

64.     As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

65.     Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## COUNT II

### Unjust Enrichment and Restitution

66.     Plaintiff incorporates by reference the preceding allegations.

67.     It would be inequitable for Defendants to be permitted to retain the benefit which Defendants obtained from their manipulative acts and at the expense of plaintiff and members of the Class.

68.     Plaintiff and members of the Class are entitled to the establishment of a constructive trust impressed on the benefits to Defendants from their unjust enrichment and inequitable conduct.

69.     Alternatively or additionally, each Defendant should pay restitution or its own unjust enrichment to plaintiff and members of the Class.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing plaintiff's counsel as counsel for the Class;

B.     Permanently enjoining and restraining Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, from continuing and maintaining the manipulations and conspiracy alleged in the Complaint;

C. Awarding plaintiff and the Class damages, as provided under the Sherman Act and jointly and severally, in an amount to be trebled in accordance with the Sherman Act;

D. Awarding plaintiff and the Class their costs of the suit, including attorneys' fees, as provided by law; and

E. Directing such further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, plaintiff demands a jury trial as to all issues triable by a jury.

DATED: May 9, 2011

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

BARRETT JOHNSTON, LLC
GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
217 Second Avenue, North
Nashville, TN 37201-1601
Telephone: 615/244-2202
615/252-3798 (fax)
gbarrett@barrettjohnston.com
djohnston@barrettjohnston.com
tmiles@barrettjohnston.com

- 17 -

SUGARMAN & SUSSKIND
ROBERT SUGARMAN
100 Miracle Mile, Suite 300
Coral Gables, FL  33134
Telephone:  305/529-2801
305/447-8115 (fax)
sugarman@sugarmansusskind.com

Attorneys for Plaintiff

C:\Documents and Settings\kstadelmann\Local Settings\Temporary Internet Files\OLKD\CPT LIBOR antitrust 2.doc